AL:MTK
F.#2017R00319

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    17 CR 404 (KAM)

    - against -

CHRISTOPHER CURANOVIC,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
CHRISTOPHER CURANOVIC'S MOTION FOR SEVERANCE

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York

Michael T. Keilty
Assistant U.S. Attorney
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the motion for severance filed by the defendant Christopher Curanovic. The motion should be denied because the purported speedy trial right of Curanovic is not a basis for severance. Furthermore, joinder in this matter is proper and any minimal risk of spillover prejudice to Curanovic can be remedied by less drastic measures than severance. As discussed more fully below, severance in this case would lead to precisely the sort of bad consequences – duplicative trials that create a risk of inconsistent verdicts, and that would waste judicial resources – that are avoided by joining defendants for trial.

RELEVANT BACKGROUND

On January 17, 2014, a grand jury in the Eastern District of New York returned an indictment charging Curanovic with (1) extortionate collection of credit conspiracy, in violation of 18 U.S.C. § 894(a)(1) (Count Two); (2) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Three); (3) money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B) (Count Four); (4) conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846 (Count Twenty-Two); and (6) the distribution of marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count Twenty-three). In each of these counts, Curanovic's conduct is inseparable from that of his codefendants.

As alleged in a complaint filed on June 28, 2017 (the "Complaint"), the investigation revealed that between October 2016 and June 2017, Curanovic used extortionate means to collect a debt owed by a former associate ("CS-1"). Through a DEA sting operation, including the use of wiretap evidence and confidential sources, agents were

able to determine that Curanovic and codefendants Albert Veliu and Anthony Noterile devised a scheme whereby a money-laundering operation would facilitate the payment of a preexisting extortionate debt owed to Curanovic. Veliu and Noterile all agreed to meet with a DEA source who represented himself as an associate of CS-1. During the course of the investigation, the DEA source provided the defendants with approximately $800,000 in purported drug proceeds for laundering. In recorded conversations, the defendants agreed to launder the funds in exchange for keeping a portion of the laundered funds as a commission and another portion as the payment of the extortionate debt owed to Curanovic. Additional codefendants facilitated the money laundering scheme by, among other things, exchanging the cash for purportedly "clean" checks supported by fraudulent paperwork (the "Check Writing Defendants"). Beginning in April 2017, Veliu informed a DEA source that he had access to firearms in Kosovo. During one recorded conversation, Veliu and the source agreed to refer to AK-47s as "sneakers" and to rockets as "Shaq-sized sneakers." Veliu discussed the sale of weapons to the DEA source with Curanovic. After accepting payment for fifteen AK-47s, Veliu traveled to Kosovo to deliver the firearms to an individual he believed to be a Kosovo-based associate of the DEA source. Additionally, during the course of the money-laundering scheme, Curanovic and Veliu conspired to sell five pounds of marijuana to the DEA source.

## ARGUMENT

The motion should be denied because an adjournment was properly granted – and time was properly excluded – as to Curanovic's codefendants (the "Codefendants"); Curanovic is properly joined to the Codefendants; and the delay attributable to the

Codefendants is properly charged to Curanovic and is not a basis for him to be severed. Furthermore, any risk of spillover prejudice stemming from a single count of a twenty-three count indictment can be mitigated by a proper limiting instruction.

I.      <u>Applicable Law</u>

    A.      <u>Rule 8(b)</u>

Where an indictment charges multiple defendants with multiple offenses, joinder is governed by Rule 8(b) of the Federal Rules of Criminal Procedure. <u>United States v. Turoff</u>, 853 F.2d 1037, 1043 (2d Cir. 1988). This Rule provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).

Joinder of defendants under Rule 8(b) is proper "where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." <u>United States v. Rittweger</u>, 524 F.3d 171, 177 (2d Cir. 2008) (quoting <u>United States v. Cervone</u>, 907 F.2d 332, 341 (2d Cir. 1990) and <u>United States v. Attanasio</u>, 870 F.2d 809, 815 (2d Cir. 1989)) (internal quotations omitted); <u>see also</u> <u>United States v. Rucker</u>, 32 F. Supp. 2d 545, 548 (E.D.N.Y. 1999).

"There is a preference in the federal system for joint trials of defendants who are indicted together." <u>Zafiro v. United States</u>, 506 U.S. 534, 537 (1993). "Joint trials play a vital role in the criminal justice system. [They] promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." <u>Id.</u> (internal

4

quotations omitted). "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." Salameh, 152 F.3d at 115. Indeed, "a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)." United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988).

The Second Circuit applies "a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice. . . ." Rittweger, 524 F.3d at 177. Indeed, this Circuit has routinely upheld joinder of defendants charged in an indictment that alleges multiple schemes, so long as the schemes share a substantial identity of facts or participants, or arise out of a common plan or scheme. See, e.g., Rittweger, 524 F.3d at 177-79 (affirming joinder where two schemes shared common plan and key participants, notwithstanding that certain defendants were not alleged to have been aware of or participated in each other's schemes); United States v. Feyrer, 333 F.3d 110, 114-15 (2d Cir. 2003) (affirming joinder where separate conspiracies shared common plan and participants, notwithstanding that certain defendants were not alleged to have participated in all conspiracies); Turoff, 853 F.2d at 1043-44 (affirming joinder of defendants where indictment charged one scheme that "stemmed from" the other); Cervone, 907 F.2d at 341 (rejecting defendant's improper joinder claim under Rule 8(b) even though "the link" between the defendant and other defendants was "somewhat tenuous"); Attanasio, 870 F.2d at 814-815.

5

B.    Rule 14

Rule 14 of the Federal Rules of Criminal Procedure provides that a district court may grant a severance, or "provide any other relief that justice requires," if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . ." However, "[a] defendant raising a claim of prejudicial spillover bears an extremely heavy burden." United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988). A defendant must show that he suffered prejudice so substantial that there would be a "miscarriage of justice." United States v. Yousef, 327 F.3d 56, 150 (2d Cir. 2003). "The principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993). The decision of whether to grant a motion for severance under Rule 14 is "confided to the sound discretion of the trial court." Feyrer, 333 F.3d at 114 (citations omitted).

The Supreme Court has held that severance should be granted pursuant to Rule 14 only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. As the Second Circuit has recognized, "joint trials serve the public interest in economy, convenience, and the prompt trial of the accused." Turoff, 853 F.2d at 1039 (citing United States v. Lane, 474 U.S. 76, 79-80 (1986)).

Even where the risk of prejudice is high, less drastic measures – such as limiting instructions – almost always suffice as an alternative to granting a Rule 14 severance motion. Zafiro, 506 U.S. at 539; see also Feyrer, 333 F.3d at 114. Indeed, courts have repeatedly recognized that any potential prejudice caused by a joint trial can be effectively

6

mitigated by instructions to the jury that it must consider separately each individual defendant and each charge, and consider only the evidence that has been admitted against each defendant. See Zafiro, 506 U.S. at 540-41; United States v. Hernandez, 85 F.3d 1023, 1029-30 (2d Cir. 1996); United States v. Romero, 54 F.3d 56, 60 (2d Cir. 1995). A district court's denial of a severance motion under Fed. R. Crim. P. 14 will be reversed only if a defendant can "show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion." United States v. Diaz, 176 F. 3d 52, 102 (2d Cir. 1999).

II. Discussion

      A.    Curanovic Is Properly Joined and Any Risk of Spillover Prejudice Can Mitigated with a Limiting Instructing

Curanovic argues that Count One is not "properly joined with other counts in the indictment," and, "whether properly joined or not," that he will suffer "prejudicial spillover" from the evidence of Veliu's sale of weapons. For the reasons discussed below, both of these arguments are without merit.

As an initial matter, Curanovic is charged with participating in the extortionate collection of credit against CS-1 (Count Two). This is a crime of violence. See United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) ("Certainly, it cannot be gainsaid that extortion is a 'crime of violence' as that term is defined by the [Bail Reform Act]"); United States v. Gotti, 02-CR-606 (ILG), 2002 WL 31946775, at *4 (E.D.N.Y. June 10, 2002) (acts of extortion, which by its very nature is considered to be an act of violence under the Bail Reform Act, in that threats of force and intimidation are used to collect monies and to force others to engage in acts in response to those threats.") Indeed, "extortionate means," which

7

form the basis of the charge in the Indictment, is defined as the "the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation or property of any person," 18 U.S.C. § 891(7). Curanovic will not suffer "substantial" prejudice simply because he is being tried with someone who brokered a weapons sale. His severance argument would hold more water if, for example, Veliu was charged with multiple murders. That is not the case here. In fact, as discussed in detail below, Curanovic was caught on tape considering participating in the very weapons sale he now decries will cause him prejudice.

Moreover, Curanovic cannot credibly argue that the counts in the Indictment do not "share a substantial identity of facts or participants." Rittweger, 524 F.3d at 177-179. The one common participant of nearly every count in the Indictment is Curanovic. Indeed, it was the $40,000 owed by CS-1 to Curanovic, and the subsequent extortion of CS-1 that launched this investigation (Count Two). The laundering scheme to pay back the extortionate debt was hatched by Curanovic, Veliu and Noterile (Counts Three through Five). And while Curanovic did not directly conspire with the Check Writing Defendants, the purpose of their laundering activities was, in part, to provide "clean" money to pay back Curanovic (Counts Six through Twenty-one). For his part, Curanovic did not sit idly by and wait for his money to be laundered by Veliu. Intercepted conversations revealed that Curanovic was aware of who was laundering the cash for Veliu. For example, on March 15, 2017, Curanovic called Veliu and the following exchanged occurred:

> VELIU: Alright, so today I called him, I said bro you know you gotta fucking . . . I said I'll wait for this until I get the other fifty. You

8

|  |  |
|---|---|
|  | know so I wanna make it a fucking hundred, I mean ninety-nine. |
| CURANOVIC: | Yeah. |
| VELIU: | He goes "alright, alright." So he goes "uh probably I'll call you tonight or tomorrow." I said no you gotta let me know bro. I says because when I go to the guy it's not gonna be tonight or tomorrow. I said he wants to know when exactly. And I said tomorrow I, I really can't. I said I gotta do some shit so let's make this tonight. So he goes "alright I'm gonna try." I said alright. |
| CURANOVIC: | Alright. |
| VELIU: | And that was it. |
| CURANOVIC: | You got somebody? |
| VELIU: | Yeah I got somebody bro. |
| CURANOVIC: | Alright the one you told me about? [I/A] the four? |
| VELIU: | Yeah, yeah. |
| CURANOVIC: | Alright. Good. Good good. |

The "he" referred to by Curanovic in this passage is the DEA source who provided Veliu with the "dirty" cash to be laundered. When Curanovic stated "You got somebody?" agents believe that he was asking Veliu if he found someone to launder the cash.

With respect to Count One, a weapons trafficking charge against Veliu, Curanovic advised Veliu about the very weapons deal that he now claims complete ignorance about. Indeed, on March 23, 2017, Curanovic called Veliu and the following exchange occurred:

9

| | |
|---|---|
| VELIU: | I know, I know bro. All right, listen, you know what he [DEA source] now tells me. |
| CURANOVIC: | Huh? |
| VELIU: | He said, "one of the big guys, on his, whatever, needs like, uh, uh, uh, not a favor but something to handle." I said, "what's up?" For metals. Do you know what kind of metals right? |
| CURANOVIC: | Yes. |
| VELIU: | Yes. 50 pieces. Okay I said that's, uh, you know, if that's, I asked, "Why?" He said, "Because you guys are Albanian and I know you do this." I said, "Hold on a second." I told him, "Do you know that if they catch you, I said you know what they're gonna label you, right?" |

Based on their training and experience, agents believe that when Veliu used the term "metals," he was referring to firearms. When Veliu stated "50 pieces," agents believe that he was informing Curanovic that an individual wanted to purchase 50 firearms from Veliu. The conversation continued:

| | |
|---|---|
| CURANOVIC: | Yeah. |
| VELIU: | He said, "No, no, I know." I don't want to even want to mention the name. But you know what they label you as, right away! |
| CURANOVIC: | Of course, of course. |
| VELIU: | You're finished! You're fucking done! You're whole fucking, the whole family DNA is fucking done bro! |
| CURANOVIC: | Of course. |
| VELIU: | So I said, "No." He said, "Listen to me" he goes, "Not in here, in the state, in, in, in |

10

|            |            |
|------------|------------|
|            | the overseas.  In Germany."  So I said, "All right." |
| CURANOVIC: | Hold on, hold on. |
| VELIU:     | What do you need?  He said, "50 and I'm gonna tell him 10 a piece."  I said, "No, no, if you wanna do it, but if you don't want to, don't worry about it but he said, "You and me [U/I]."  I said, "all right."  So I don't know Cuz.  I mean my guy that I have in the Czech Republic, he's . . . known in this shit bro.  I don't know. |

When Veliu stated, "I mean my guy that I have in the Czech Republic, he's . . . known in this shit bro," agents believe that Veliu was referring to the fact that he knows a gun trafficker based in the Czech Republic.  The conversation continued:

| CURANOVIC: | If, if, if it was me I . . . |
|------------|------------------------------|
| VELIU:     | What do you . . . yeah? |
| CURANOVIC: | First of all, with this, I could help him out and- |
| VELIU:     | Uh hmm. |
| CURANOVIC: | Now it kind of like make, makes you think, "What the fuck is this guy talking about?" |
| VELIU:     | Right.  I know. |
| CURANOVIC: | Now he's talking about all kinds of different things.  Yo . . . |
| VELIU:     | I know. |
| CURANOVIC: | Yo, who told you, Anthony told you, or who told you that they know this guy? |
| VELIU:     | I didn't hear you. |

11

| | | |
|---|---|---|
| CURANOVIC: | | Who told you that they knew him? |
| VELIU: | | Anthony. |
| CURANOVIC: | | Yeah . . . when he sees you does he talk stupid? |
| VELIU: | | No. Absolutely not. He says bro, he said, goes, listen, he goes, you know, I just keep profile, he goes, uh, I'm, I told him, he goes, "I'm not a big, big guy" he goes [I/A]. |
| CURANOVIC: | | Can you hear me? |
| VELIU: | | Fuck it, he goes but, mind you [I/A] low profile to overseas, whatever, you know what I mean. He told me some crazy shit in the car, and I was like, "What the fuck?" |
| CURANOVIC: | | Just tell him, just tell him . . . |
| VELIU: | | I'm saying to myself like yeah . . . |
| CURANOVIC: | | In time, slowly. You know . . . take it easy. |

As an initial matter, Curanovic informed Veliu that he could assist him with the procurement of weapons ("First of all, with this, I could help him out"). While Curanovic ultimately advised Veliu against brokering the weapons deal, his objection was anything but virtuous. Rather, Curanovic advised Veliu not to engage in firearms trafficking because he wasn't sure that they could trust the DEA source ("Yo, who told you, Anthony told you, or who told you that they know this guy?"). Ultimately, Curanovic's criminal instincts proved correct. Presumably, Curanovic would have provided his blessing to the weapons deal if the sale was to someone he deemed a trustworthy coconspirator. Later in the conversation, Curanovic

12

held out the possibility of a future weapons sale with the DEA source ("In time, slowly. You know . . . take it easy.").

In sum, all of the counts in the Indictment are properly joined because they are unified "by some substantial identity of facts or participants, or arise out of a common plan or scheme." Rittweger, 524 F.3d at 177-179. Accordingly, Curanovic's joinder argument is without merit.

Curanovic's motion also falls far short of the "extremely heavy burden" of showing substantial prejudice that would require severance under Rule 14(a). As an initial matter, even assuming, arguendo, that there exists spillover prejudice, it can hardly be characterized as a "miscarriage of justice" based on Curanovic's conversation with Veliu about the sale of firearms to the DEA source. Moreover, the very evidence that Curanovic considers prejudicial would most likely be introduced in a severed trial under Rule 404(b). See, e.g., United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) (evidence admissible under Rule 404(b) to "explain the mutual trust that existed between conspirators.").

In any event, the Supreme Court has recognized that "limiting instructions are often sufficient to cure any risk of prejudice." Zafiro, 506 U.S. at 539; see also United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003) (district court's explicit instruction that jury consider defendants individually remedied spillover prejudice); United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997) (nothing that spillover prejudice may be cured through clear judicial instructions); United States v. Rivera, 09 CR 619, 2011 WL 1429125, at *6 (E.D.N.Y. Apr. 13, 2011) (noting "defendants may request any appropriate limiting instruction, or other remedial measure, at trial" to avoid spillover prejudice).

Any prejudice that might be present, is not sufficiently severe to outweigh the burden that the government would face in essentially having to try the same case twice. A proper limiting instruction can mitigate any risk of spillover prejudice.

      B.      The Delay Attributable to Codefendants Is Properly Charged to Curanovic, and Is Not a Basis for Severance

The Speedy Trial Act, codified at 18 U.S.C. §§ 3161 to 3174, provides that trials should generally commence within 70 days of a case being initiated. 18 U.S.C. § 3161(c)(1). However, the Act also provides a list of "periods of delay [that] shall be excluded . . . in computing the time within which the trial of any such offense must commence." 18 U.S.C. § 3161(h). This list includes "[a]ny period of delay resulting from a continuance granted by any judge . . . at the request of the defendant or his counsel . . . if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).

When determining whether to grant a continuance based on the ends of justice, a district court must consider, among other factors, "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice," 18 U.S.C. § 3161(h)(7)(B)(i), and "[w]hether the failure to grant such a continuance . . . would unreasonably deny the defendant . . . continuity of counsel, or would deny counsel for the defendant . . . the reasonable time necessary for effective preparation, taking into account the exercise of due diligence," 18 U.S.C. § 3161(h)(7)(B)(iv).

An exclusion of time premised on the Speedy Trial Act is not a basis for severance. As an initial matter, the Act specifically identifies periods of delay that "shall" be excluded in computing the time within which trial must commence, including "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6). This statutory text is, in itself, a sufficient basis to apply the adjournment requested by the codefendants, and the resulting exclusion of speedy trial time, to Curanovic.

In addition, and as the Second Circuit has observed, Congress made clear that the Speedy Trial Act was not intended to alter the rules generally governing severance:

> The Senate Report states that "[t]he purpose of [Section 3161(h)(7)][1] is to make sure that [the Act] does not alter the present rules on severance of codefendants by forcing the Government to prosecute the first defendant separately or to be subject to a speedy trial dismissal motion under Section 3161." S. Rep. No. 1021, 93d Cong., 2d Sess. 38 (1974). Congress clearly intended that, where appropriate, joint trials of defendants should continue to be available as a means of promoting judicial efficiency by avoiding duplicative proof at successive trials. It thus intended that reasonable speedy trial time be excludable under Section 3161(h)(7) when necessary to enable joint trials to go forward.

United States v. Pena, 793 F.2d 486, 489 (2d Cir. 1986) (brackets other than footnote number in original). In a subsequent discussion of the Act, Congress noted that:

> Defendants who are properly charged with the joint commission of an offense should ordinarily be tried together to save the time, expense and inconvenience of separate prosecutions. It has been reported that some trial judges have granted severances unnecessarily in multidefendant cases "so that a defendant

---

[1] The current text of Section 3161(h)(6) was, when Pena was decided, located in Section 3161(h)(7).

> whose case is moving too slowly does not hold up the trial of his codefendants." . . . If the Act has been interpreted to require such a result, the Committee calls to the Senate's attention § 3161(h)(7) [i.e., current Section 3161(h)(6)], which provides specifically for exclusion of "a reasonable period of delay when the defendant is joined for trial with a codefendant as to whom trial has not yet run."

S. Rep. No. 96–212, 96th Cong., 1st Sess. 24–25 (1979).

Therefore – and to carry out Congress's intentions – the Speedy Trial Act provides that when the speedy trial clock stops for one defendant, it stops for all co-defendants as well. More specifically, as noted above, the list of periods that "shall" not be counted for speedy trial purposes includes "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6). In other words, and as the Second Circuit and district courts within the Circuit have repeatedly observed, "[a]ny delay attributable to one defendant applies to all codefendants." United States v. Muyet, 2000 WL 1275925, at *4 (2d Cir. Sept. 8, 2000); see also Pena, 793 F.2d at 488-89; United States v. Stone, 05 CR 401 (ILG), 2006 WL 436012, at *6 (E.D.N.Y. Feb. 22, 2006); United States v. Columbo, 418 F.Supp.2d 385, 390 (S.D.N.Y. 2005); United States v. Lindauer, 03 CR 807 (MBM), 2004 WL 2813168, at *2 (S.D.N.Y. Dec. 6, 2004); United States v. Gambino, 784 F. Supp. 129, 138 (S.D.N.Y. 1992).

In this case, the delay is attributable to the request of Curanovic's Codefendants – all of them – to review discovery and to engage in plea negotiations with the government. Indeed, in light of the text of Section 3161(h)(7)(B)(i) and (iv), the decision to grant the adjournment request and exclude time was legally compelled. Under Section

16

3161(h)(6), the delay attributable to Curanovic's Codefendants is properly charged to Curanovic, and in light of the Second Circuit's opinion in Pena and the legislative history of the Speedy Trial Act, this adjournment is not a basis for him to be severed from the Codefendants

In addition, granting severance "would impair both the efficiency and the fairness of the criminal justice system" by requiring "that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." Richardson, 481 U.S. at 209-10. Indeed, and significantly, severance would create a risk of "the scandal and inequity of inconsistent verdicts." Richardson, 481 U.S. at 210; see also Bruton, 391 U.S. at 134 (joint trials conserve state funds, diminish inconvenience to witnesses, and avoid delays). This is another separate and independent reason that joint trials are almost always preferred, and another basis to deny Curanovic's motion.

<u>CONCLUSION</u>

There is no legal basis for severance, and granting severance would result in precisely the harms that the Supreme Court and Second Circuit have repeatedly instructed can and should be avoided by joinder. The government therefore respectfully requests that Court deny the defendant's motion.

Dated: Brooklyn, New York
       August 22, 2017

                                          Respectfully submitted,

                                          Bridget M. Rohde,
                                          Acting United States Attorney,
                                          Eastern District of New York

By:    /s/_____
       Michael T. Keilty
       Assistant U.S. Attorney
       (718) 254-7528