

The Law Office of
Elizabeth E. Macedonio

December 11, 2019

**Electronically Filed**

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201

Re: <u>United States v. Christopher Curanovic</u><br>17 Cr. 404 (KAM)

Dear Judge Matsumoto:

  This letter is submitted for Your Honor's consideration in the sentencing of Christopher Curanovic in the above-referenced matter. Mr. Curanovic is scheduled for sentencing before the Court on December 20, 2019 at 10:30 in the morning, following his plea of guilty to Count Three, Conspiracy to Launder Proceeds of Narcotics Trafficking, in violation of 18 U.S.C. §§ 1956 (a)(3)(B) and 1956(h). Mr. Curanovic is a 38-year-old man who has been in custody since March 17, 2008 – nearly twelve years.  As demonstrated below, as a child and young adult, Mr. Curanovic was forced to endure what he perceived to be his mother's complete abandonment, periods of homelessness, total isolation from his relatives, the murder of his brother, and the painful death of his mentally ill father. It is with this backdrop that an analysis of Mr. Curanovic's life must begin. But, despite these painful facts, and perhaps against all odds, Mr. Curanovic has formed long-lasting relationships with highly capable and successful people.  People who remain supportive of him, despite his criminal history and his extended period of incarceration. It is these people who serve as Mr. Curanovic's motivation for making positive life changes and putting his criminal history behind him.

1

In light of the factors discussed herein, as well as comments to be made at the time of sentencing, it is submitted that a sentence of "time served" would be sufficient but not greater than necessary to promote the statutory goals and purposes of criminal sentencing provided under Title 18 U.S.C. § 3553(a).

I.    **Facts of the Case**

Mr. Curanovic is before the Court on one count of Conspiracy to Launder Proceeds of Narcotics Trafficking. This is a crime for which he accepts full responsibility. However, there are significant inaccuracies in the factual narrative of this case that mitigate the offense and Mr. Curanovic's role.

While other defendants in this case may have had additional motivations for their conduct, for Mr. Curanovic, this case is about the collection of a ten year old, $40,000 debt owed to Mr. Curanovic by a former business partner known as CS-1. Mr. Curanovic was not involved in the larger schemes concocted by the other defendants involving the laundering of nearly $800,000 and the illegal sale of arms. Rather, Mr. Curanovic agreed to the money laundering conspiracy only after it was underway.

The Defense vigorously disputes the characterization of the original loan as an "extortionate debt." In 2007, CS-1 and Mr. Curanovic owned an auto body shop, "Crash Collision," together. CS-1 owed a debt to a loan shark that he had taken out to purchase his home. Mr. Curanovic learned of the debt owed by CS-1 because the loan shark was visiting the business to collect and because CS-1 was taking money out of the business to make his payments. In order to avoid bankrupting the business and to eliminate the loan shark from frequenting the auto body shop, Mr. Curanovic loaned CS-1 $40,000 so that CS-1 could pay off the loan shark. This loan

was not an exchange for protection money as now claimed by CS-1. Tellingly, Mr. Curanovic has never asked CS-1 for any interest on this loan.

We now know that CS-1 has been cooperating with the government since 2005. (See Complaint, Docket Entry 1, Page 5, Footnote 1.) Mr. Curanovic was arrested in this District on March 17, 2008. And while he was tried, convicted and sentenced, the issue of the protection money was never raised at any stage of the proceeding. Rather, CS-1 did not report this loan to agents of the government until 2016, when Mr. Curanovic, who was preparing to be released from custody, got in contact with CS-1 asking that he start making payments on the ten year old – interest free loan.

The communications between Mr. Curanovic and CS-1 were in large part pleasant. Indeed the communications started when CS-1 sent his regards to Mr. Curanovic. We dispute the assertion that Mr. Curanovic engaged in extortionate behavior to collect this debt. In fact, there are no allegations that Mr. Curanovic sent anyone to intimidate or threaten CS-1 to repay the debt. And, prior to CS-1 reaching out to Mr. Curanovic, CS-1 had not seen or heard from Mr. Curanovic for nearly a decade, nor had he made any payments towards the debt.

Rather than an extortion, Mr. Curanovic's statements to CS-1 were expressions of frustration that CS-1 never paid him back and that CS-1 needed to "be a man and take care of it." Notably, the PSR omits a subsequent conversation in which Mr. Curanovic apologized to CS-1 for getting angry. There simply was no extortionate debt or extortionate collection of a debt here.
A more accurate description of the facts is as follows: After being in custody for several years, Mr. Curanovic reached out to an old friend whom he had loaned $40,000. While Mr. Curanovic was in custody, this friend had made no payments on his outstanding debt.

At the direction of the DEA, on October 23, 2016, CS-1 spoke with Mr. Curanovic to tell him that "he wanted to begin to make payments on his debt." (PSR ¶7) In fact, CS-1 agreed to a payment schedule of $2,000 per week and that the money would be proved by an associate of CS-1. This associate, CS-2, was also acting at the direction of the DEA. Since Mr. Curanovic was in custody, he told CS-1 that the money could be given to Anthony Noterile. The next day CS-2 gave the $2,000 to Anthony Noterile as promised. Mr. Curanovic in turn asked Noterile to give the money to Albert Veliu.

Despite the fact that CS-1 had agreed to make payments on the debt every two weeks, months went by without word or payment. Then, on January 18, 2017, Mr. Curanovic voiced his frustration with CS-1 via text messages. But to be clear, in the intervening months, no one was sent to speak with CS-1 nor was he contacted in any manner. Moreover, after this text exchange with CS-1 on January 18, 2017, Mr. Curanovic never contacted CS-1 again.

The following day, January 19, 2017, CS-1 and CS-2 met with Noterile. Mr. Curanovic was not present at this meeting. At the direction of the DEA, CS-1 and CS-2 laid out for Noterile, a money laundering scheme wholly created by the DEA that included the laundering of narcotics proceeds and percentages that, according to the plan set forth by the DEA, would be provided to Mr. Curanovic. If indeed this was simply an extortionate collection of an extortionate debt, a crime was underway. There was no need for the DEA to introduce all of the additional temptations which translate into sentencing enhancements. In any event, it bears repeating that Mr. Curanovic was not present at this meeting nor was he immediately given the details.

Thereafter, on January 26, 2017, CS-2 met with Noterile and gave him $20,000 in cash. Noterile accepted the money, but did not provide a check in return. At this point, Mr. Curanovic believed that this money was simply a payment of the $40,000 debt made on behalf of CS-1. When

CS-2 later demanded a check and began using threats and intimidation, Mr. Curanovic agreed to the money laundering scheme to repay CS-2.

It is now abundantly clear that, in the months that followed, Albert Veliu was operating on his own. Even Noterile, who was present and participating faded out of the picture while Albert Veliu and CS-2 continued to engage in various transactions. But what is clear, however, is that Mr. Curanovic was not present during the numerous meetings between CS-2 and Albert Veliu. While the PSR is replete with references to Albert Veliu meeting with CS-2, and although the government was recording Albert Veliu's telephone calls, including the calls he had with the rest of the defendants, there is no evidence that Mr. Curanovic was informed of the on-going money laundering conspiracy.

The Defense asserts that Mr. Curanovic was aware of the laundering of $120,000. This consists of the original twenty-thousand dollars on January 26, 2017 and two additional sums of $50,000 dollars the DEA gave to Albert Veliu on March 14, 2017 and March 16, 2017. The PSR (¶¶ 17-19) details conversations between Mr. Curanovic and Albert Veliu regarding the two $50,000 sums, but these Paragraphs make clear that Albert Veliu was not forthcoming even about the amount of money he received. In fact, he told Mr. Curanovic that he had received $49,000 when he had received $50,000. What is striking about these conversations is not what **is** said, but what **is not** said. When Albert Veliu told Mr. Curanovic that he had just received nearly $100,000 in cash, Mr. Curanovic made no comment at all to Albert Veliu about the money. He did not ask when he was getting a part of the money. Nor did he ask any questions about who was getting the money. Rather, he remained silent on the topic. And, significantly, there is no evidence that Mr. Curanovic ever received any percentage of the money Albert Veliu made during the course of

Veliu's money laundering efforts. This is the extent of Mr. Curanovic's involvement in the money laundering conspiracy.

A review of the docket sheet reveals that several of the defendants involved in the money laundering conspiracy have been sentenced by the Court. All but one, Ekram Sejdija, received probationary sentences. According to the sentencing submissions, including those submitted by government counsel, these defendants were involved in money laundering amounts as follows:

| Defendant | Amount Involved | Sentence |
|---|---|---|
| Ekram Sejdija | $293,000<br>($50,000 + $243,000) | 21 days custody |
| Martin Shkreli | $150,000 | 30 months' probation |
| Xhevat Gocaj | $50,000 | 24 months' probation |
| Alban Veliu | $50,000 | 24 months' probation |
| Agim Rugova | $20,000 | Time served (1 day) /<br>2 years' supervised<br>release |

While Mr. Curanovic's personal background and guideline calculation are different from these defendants, as set forth below, he has already served an extensive period of time in custody for this offense.

## II.    Guideline Calculation

There is no stipulated agreement between the parties with regard to the guideline calculation. And, while the government sets forth its estimate in the plea agreement, the Probation Department has arrived at a different analysis in the Presentence Report. Based upon the facts of the case, the Defense asserts that following is the correct computation of the guidelines.

| | | |
|---|---|---|
| Base Offense Level | 2S1.1 (a) (2) | 8 |
| Value of the Funds | 2B1.1 (b) (1) | +8 |
| Proceeds of Narcotics Sales | 2S1.1 (b) (1) | +6 |
| Conviction under 18 U.S.C. § 1956 | 2S1.1 (b) (2) | +2 |
| Acceptance of Responsibility | 3E1.1 | -3 |
| Total Adjusted Offense Level | | 21 |

With a Criminal History Category of III this results in an advisory range of incarceration of 46-57 months' incarceration. However, the advisory guideline calculation markedly overstates Mr. Curanovic's culpability and does not correlate with the sentences received by equally culpable co-defendants.

The sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Although the Court's sentencing analysis must begin "by correctly calculating" the applicable advisory United States Sentencing Guidelines ("Guidelines") range, *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)), that advisory Guidelines range is but one element of the Court's consideration in determining the appropriate sentence. Indeed, "District judges are not permitted to treat the Sentencing Guidelines as reasonable," and "have an obligation to consider whether a sentence other than a Guidelines sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing." *United States v. Corsey*, 723 F.3d 366, 382 (2d Cir. 2013), as corrected (July 24, 2013); *accord United States v. Davalos*, 99 CR 1250-01 (RWS), 2008 WL 4642109, at *1 (S.D.N.Y. Oct. 20, 2008) (stating that a sentencing judge "may not presume that the Guidelines range is reasonable" (quoting *Gall*, 552 U.S. at 40).

"In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is prized." *United States v. Sloane*, 308 F.R.D. 85, 87 (E.D.N.Y. 2015). Thus, "district courts are now allowed to impose a sentence that varies from the Guidelines based solely

on disagreements with the Guidelines, as long as they state the basis for their disagreement along with sufficient justifications for the extent of any departure." *United States v. Parris*, 573 F. Supp. 2d 744, 754–55 (E.D.N.Y. 2008) (internal citation and quotation marks omitted).

Here, there are three areas of concern regarding the application of the guidelines. Specifically, i) value of the funds, ii) proceeds of narcotics sales and, iii) conviction under 18 U.S.C. §1956. All three of these enhancements were controlled by the government and not dictated by Mr. Curanovic.

**Value of the Funds**

It was the DEA that decided how much money to give Albert Veliu. Mr. Curanovic was simply looking to get his $40,000 loan back. If the DEA would have stuck to that amount, there is an argument that Mr. Curanovic's guideline calculation would decrease by 4 points under 2B1.1 (b)(1)(C).

Further, the application of 2B1.1 seems entirely misplaced in this case, as there was no "loss." Section 2B1.1 is after all a "loss chart." If we were instead to focus on Mr. Curanovic's gain in this case, then under 2B1.1, no enhancement would apply as his gain was less than $6,500.00.

And finally, the application of Section 2B1.1 has so routinely been called into question in cases of this kind that the Criminal Justice Section of the American Bar Association developed a task force to create "shadow guidelines" in economic cases.[1] These "shadow guidelines" highlight

---

[1] In April 2013 the Criminal Justice Section of the American Bar Association assembled a Task Force to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms. The Task Force included prominent judges and law professors, including U.S. Court of Appeals for the Second Circuit Judge Gerard Lynch, Eastern District of New York Judge John Gleeson, Southern District of New York Judge Jed Rakoff, Harvard Law professor and former District of Massachusetts Judge Nancy Gertner, Duke Law professor Sara Sun Beale, and Yale Law professor Kate Stith. The Task Force published its report on November 10, 2014.

not only disparity, but general disagreement in the use and rational of the current guideline system in monetary cases.

### **Proceeds of Narcotics Sale**

The insertion of the concept of drug proceeds in this case was entirely on the part of the DEA.  Mr. Curanovic had no control over this and was not present when it was discussed. Moreover, as stated during his allocution, it was not until the money laundering conspiracy was well underway that Mr. Curanovic learned that CS-2 had asserted that the proceeds were from the sale of narcotics. And, it must be highlighted, that indeed these were not narcotics proceeds.  If the DEA had not added this to the story, Mr. Curanovic's guideline calculation would automatically decrease by 6 points.

### **Conviction Under Title 18 U.S.C. §1956**

Finally, if Mr. Curanovic were permitted to plead to an alternative statute, the 2 point enhancement under 2S1.1 (b) (2) would not apply.

All three of these factors were controlled by the government and not the conduct of Mr. Curanovic.  So while the government asserts in the plea agreement that the guideline range is 70-87 months, one could easily imagine a scenario where the guideline calculation was significantly lower. It is within Your Honor's discretion to impose a sentence that varies from the Court's ultimate guideline calculation based solely on disagreements with the guidelines. In this case there are several reasons why the Court could take issue with the guidelines and impose a sentence significantly lower than prescribed by a mechanical application of the guidelines.

As noted above, several of the defendants in the money laundering conspiracy have already been sentenced to probationary sentences and/or sentences below their applicable guideline ranges. This is clearly an indication that the advisory guidelines do not fit in this case. But perhaps the

most compelling argument that the guidelines seriously overstate the conduct in this case is the government's position that Albert Veliu should receive a sentence of 135-168 months. According to the submissions of counsel, Albert Veliu's total adjusted offense level is 43. The corresponding range of incarceration is life. The government has agreed to a ten-level reduction to the guidelines, while defense counsel seeks a fifteen-level reduction. While Albert Veliu's conduct in this case was far more egregious than Mr. Curanovic's, if the same reductions were applied to Mr. Curanovic's case, the sentence requested herein is appropriate. The government's agreement to such a dramatically different sentence for Albert Veliu than that called for by the guidelines can only be attributed to the unique facts of this case. Namely, that the guidelines in this case were manipulated by the DEA resulting in the astronomical advisory ranges of incarceration.

## III.     The 3553(a) Factors

As relevant here, section 3553(a) instructs that in addition to the advisory guideline range, the Court should consider several factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed" to "provide just punishment" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). The factors enumerated in section 3553(a) are the "bedrock of all federal sentencing." *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). In crafting the proper sentence, the "district judge should . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing," the judge "must make an individualized assessment based on the facts presented." *Davalos*, 2008 WL 4642109, at *1 (quoting *Gall,* 552 U.S. at 40). "A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not." *United States v. Ramirez*, No. 09 CR. 751 (RWS), 2009 WL 4722237, at *2 (S.D.N.Y. Dec. 4, 2009).

As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). Indeed, although "[t]he Guidelines virtually ignore this measure of the man, . . . the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence." *Gupta*, 904 F. Supp. 2d at 354; *accord United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad . . . was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'").

**<u>Personal Background</u>**

Mr. Curanovic has been incarcerated since he was 26 years old. Prior to his arrest in 2008, Mr. Curanovic had no criminal record. In fact, he is a college graduate from Fordham University and worked for a hedge fund in his early twenties. Mr. Curanovic had a bright future ahead of him. Indeed, his educational and employment history are hard to reconcile with his involvement in the criminal justice system. The Defense has submitted a series of letters written by family, friends, employers and mentors on behalf of Mr. Curanovic. ("Exhibit A") Through the eyes of the people who are deeply familiar with Mr. Curanovic and his life story, it is plain to see that he has endured a multitude of hardships and tragedies. These people also recognize Mr. Curanovic as an intelligent, hardworking, compassionate man who to this day inspires their support. To look at Mr. Curanovic's personal history is to understand what contributed to his involvement in the criminal

justice system and to see that a further period of incarceration is simply unnecessary to punish Mr. Curanovic or to deter future criminal conduct. Moreover, Mr. Curanovic has a strong network of support to assist him in reentering the community and achieving his true potential. Mr. Curanovic's letter to the Court is annexed as "Exhibit B."

**<u>Early Life</u>**

Mr. Curanovic was born in the Bronx to Michelle Stephan and Anton Curanovic. He had one older brother named Nicholas. Anton Curanovic was a violent, mentally ill man who subjected his family to extreme domestic abuse. As Mr. Curanovic's maternal aunt Pamela Fisette explains in her letter to the Court:

> I am very close with my sister, Chris's mother Michelle and was by her side during all her trials and tribulations as a young adult. Michelle married young to a very possessive and manipulative man who later turned to physical abuse and violence to control my sister. During her marriage Michelle was forbidden to hold a job, manage any money, and was truly unable to make basic day-to-day decisions. I believe this is important for you to know the type of environment that Christopher and his brother were born into.

Mr. Curanovic's childhood was framed by constant mental and physical abuse, his father's coercion and his mother's repeated attempts to escape. Another one of Ms. Stephan's sisters writes:

> His parents were having many problems much due to his father's violent, psychotic and controlling behavior which I had witnessed firsthand. His father worked hard at attempting to sever our family ties with each other limiting my sister's visits with the 2 boys until finally she was no longer allowed to come. That lead into my sister trying to flee the mental and physical abuse and come live with our parents. Each time though Chris's father's phone calls and promises to change, they would go back home hoping for change. Gradually these years took a tremendous toll on the boys and their mother. Their father had such a[n] engulfing hold on them threatening them all if they ever left for good.

The abuse was so horrific that Ms. Stephan's family had to rescue her to save her life. After a particularly horrifying assault, Ms. Stephan's family helped her escape her husband along with the two boys. Mr. Curanovic was only 9 years old at the time. As Ms. Stephan writes in her letter:

Unfortunately, those early opportunities that I had with Chris were short lived. As a victim of domestic violence with Chris's father who was extremely violent, controlling, threatening and intimidating, I was forced to escape the everyday torture and brought Chris and his brother to live with my parents and me.

The escape for Mr. Curanovic would be short lived. As is the case with many domestic abusers, Anton Curanovic was able to effectively leverage his emotional and physical power to gain custody of the children and separate them from their mother. Once Anton Curanovic had custody of the boys, he took even more drastic steps to isolate and control them. He moved the children frequently, changed his phone number and left no way to for Michelle Stephan to find her boys. Ms. Stephan and her family searched desperately for the boys but to no avail. Ms. Stephan's sister Linda Fuller writes:

I remember the years of my sister desperately trying to find her boys, my nephews. She would drive helplessly around areas of the many neighborhoods they had lived often close to poverty level, looking for them as their father made them move frequently. It was so hard as there was no internet or computers back then. There were no neighbors to ask. There was very little paper trail for her to follow.

As a child, Mr. Curanovic did not understand the circumstances behind his mother's separation from the family. Under his father's influence, he came to believe his mother had abandoned him. Indeed, Mr. Curanovic was constantly told that his mother had left him, that she didn't love him and that she no longer wanted to see him or his brother. Of course, this was easy for him to believe as his mother was no longer present in his life in any way due to his father's complete manipulation. Tragically, he carried this belief with him well into his adulthood, having lost all contact with his mother and her family. As recently as five years ago, Mr. Curanovic was unaware of the truth; that his mother had been desperately searching for him for decades. It was only when Mr. Curanovic was in the Bureau of Prisons database that his mother was finally able to find him through internet searches. As she writes in her letter to the Court:

I searched for Chris for many years on the internet, contacted schools, Department of Social Services, and a few paternal relatives only to come up with no information. I never gave up searching and eventually learned of Chris's incarceration.

In 2014, Ms. Stephan contacted Mr. Curanovic. He had to learn the earth shattering news that his whole perception of his mother was false from inside prison walls. While he could now have calls and visits with his mother and her family, a true reunification was obviously limited by being in prison. In spite of this, over the last five years, Mr. Curanovic has become close with his mother and family. In their letters to the Court, Your Honor will see that he has a strong network of family support and they desperately await his return home. As Mr. Curanovic's maternal grandmother Dolores Fisette writes:

I currently live in North Carolina and did get the opportunity to visit Chris in Fort Dix Prison. When I first saw him there, it was like time stopped and I remembered him like he was all those years before. I kissed and hugged him, and we sat holding hands. It felt so good to be with my grandson again. Today my only wish is for Christopher to be released from his very long time in prison and that he may be returned to his family. I truly believe with our emotional and financial support he can have a productive and loving life. I want him to feel the sun on his face and walk on the beach with us once again!

In addition to going through life with feelings of abandonment from his mother, Mr. Curanovic experienced other serious trauma as a child and young man. Not only did Mr. Curanovic's father abuse his mother, he abused the children as well. He routinely beat Mr. Curanovic, belittled him and worked to alienate him from other people. He was an alcoholic who had serious mental health issues that became worse during Mr. Curanovic's adolescence and early adulthood. Mr. Curanovic's father developed religious delusions and began traveling from place to place to "preach the word of God." He often dragged the boys along to give sermons, even if he were preaching on the side of a busy city intersection to passersby. By this time, Mr. Curanovic had only sporadic contact with relatives from his father's family but they too noticed the distress

that he and his brother were living in. Mr. Curanovic's paternal aunt Milena Curanovic writes in her letter:

> Once I saw my brother Anton (Christopher's father) I could not believe what I am seeing. He seems to be a totally different human being; he grown a long beard probably more than a foot long. The first thing that Anton said to me was, "Pray to the Lord". I saw a new man, and not the brother I knew. The hardship for Christopher continued during his teenage years. I learned that Christopher and his brother Nick (R.I.P.) lived almost a nomadic life.

Mr. Curanovic's father had trouble keeping a job and the boys lived in poverty. Sometimes they were even homeless after having been evicted and having all their possessions thrown to the curb. Anton Curanovic moved his boys around frequently and thus they were not able to form stable attachments with friends, schools and teachers. By the time Mr. Curanovic was 17 he had moved over six times including to Yugoslavia for one year.

When there was not enough money in the house for food, electricity or heat, Anton Curanovic would, in true dictator fashion, scream at his two young boys as if it were their fault. He would tell them to "be men" and address the problems they were having. Mr. Curanovic recalls as a twelve-year-old child feeling helpless and desperate to fix things. He felt an overwhelming need to make things better so that his father would stop berating him and so that there would be momentary peace in the house. All the while, Anton Curanovic moved his two young boys to more and more remote places so that he could hide them from the world.

Eventually Anton Curanovic cut off all ties with his family as well. And in much the same way he had blamed his wife for not having contact with her children, he did the same with his family. Mr. Curanovic and his brother were told that they were not accepted by their father's family because their mother was not Albanian. His goal of total family isolation was now complete. Anton drilled into his children's heads that "no one cared" about them, that "no one loved" them.

Upon reflection, Mr. Curanovic believes that this was his father's way of "toughening" them up, but the result was that the children believed they were not loved. They received no affection from their father and their mother was gone. Mr. Curanovic does not recall a single normal holiday or birthday.

With only his brother to share the harrowing and isolating experiences of his childhood, Mr. Curanovic developed an exceptionally deep bond with his brother. Nicholas too was an extremely intelligent and promising young man. Despite all of the moving and utter chaos in his life, Nicholas was accepted to The George Washington University on a full scholarship where he excelled and had been accepted to law school. For a period of time, Mr. Curanovic and Nicholas lived together at the University sharing a twin bed as Anton was once again homeless and living out of his car.

With Nicholas at school, and as their father's mental illness progressed, Mr. Curanovic bore the brunt of his wrath. But Mr. Curanovic never abandoned his father and indeed took it upon himself to work several jobs to keep a roof over his father's head and provide him with basic necessities. At this time Mr. Curanovic and his father were living in Brooklyn where Mr. Curanovic attended community college for two years before transferring to Fordham University. After having spent their entire childhood feeling helpless about the lack of money in their house, the Curanovic boys were going to live differently as adults.

In 2001, when Mr. Curanovic was 18 years old and just starting college, Nicholas had come to Brooklyn to celebrate a holiday. During his visit, a fight erupted with a neighbor over a woman in the parking garage of the apartment where they were living. Without warning, the neighbor drew a gun and shot Nicholas in the head killing him. Nicholas died in Mr. Curanovic's arms. One can only imagine the loss and anger that Mr. Curanovic experienced. It is an event from

which a person never recovers.  His sense of anger and pain was only compounded by the fact that his brother's killer got a very lenient sentence.  And, while the neighbor continued to reside in the area, Mr. Curanovic never sought retribution for his brother's murder.

Mr. Curanovic's relationship with his father was complex. He understood his father was mentally ill, violent and unstable but he also deeply loved him. After Nicholas' murder, Anton's mental illness accelerated rapidly.  Although he was always abusive and controlling, after Nicholas' murder, Mr. Curanovic states that Anton's behavior was "indescribable." He was delusional and hurtful, always carrying on about strange and nonsensical issues.  And, of course, he was in tremendous pain over Nicholas' death.  The task of easing the pain and taking care of Anton fell entirely on Mr. Curanovic with no outside intervention whatsoever.   Mr. Curanovic desperately tried to make things better for his father, to ease his pain, but he did not realize the parameters of his father's mental illness. The only thing he could do was provide basic necessities and be there for him.

As if all of this were not enough for one person to withstand, when Mr. Curanovic was 25 years old, he learned that his father had bone cancer and only had a few months to live.  While Mr. Curanovic had been working to live independently and had moved out of his father's home, he was still a dedicated son. After learning his father had cancer, Mr. Curanovic moved back home to care for him.  Once again, with no outside assistance, Mr. Curanovic lovingly cared for his father as his body rapidly deteriorated – making sure that he was bathed and fed – as he suffered from this painful disease.  When his father passed, four months later, Mr. Curanovic was sitting right there on the couch with him.  Pursuant to his father's wishes, Mr. Curanovic did not notify any family members, but rather buried his father all alone in a plot next to Nicholas.

Christopher Curanovic was now truly all alone in this world. He shunned personal relationships as he did not know how to love or be loved. But as the annexed letters demonstrate, this is clearly something he is capable of and indeed longs to achieve.

On the heels of the death of his brother, Mr. Curanovic fell under the influence of the charismatic and powerful mobster Sonny Franzese. Mr. Franzese frequented Mr. Curanovic's neighborhood and with no brother and a mentally ill father, Mr. Curanovic would unfortunately find a father figure in Mr. Franzese and the lifestyle he offered. In 2008, shortly after his father's death, Mr. Curanovic was arrested for the first time. That arrest would result in a 114 month term of incarceration. In regard to the instant offense, Mr. Curanovic's participation was based on a grave error of judgement but was ultimately situational. He was preparing for his release from prison with no savings or means to support himself and thought he could collect on a legitimate business debt. Now, having spent the last twelve years in prison - the prime of his adult life - Mr. Curanovic fully understands that he cannot get involved any illicit activities whatsoever and it is without question that he will not be returning to the streets.

### Prospects for Rehabilitation

With all of this family trauma, one might assume Mr. Curanovic is destined to live a dysfunctional and hopeless life. In fact, the complete opposite is true and this goes to the measure of his resilience and character. Notwithstanding the ongoing hardships, Mr. Curanovic graduated from high school, was admitted to Fordham University and earned a bachelor's degree. Mr. Curanovic was recognized to be a very bright and hardworking young man by his peers, employers and mentors. While in college, Mr. Curanovic landed a coveted job in a hedge fund. Through his grit, hard work and intelligence Mr. Curanovic made a significant impression on the CEO, Mr.

Guillaume Fonkenell. Mr. Fonkenell is aware of Mr. Curanovic's incarceration but still believes in him and advocates for him now. As Mr. Fonkenell writes in his letter to the Court:

> [Chris's father] asked me if I could offer [Chris] a job. I agreed but I was a bit skeptical given that Chris's academic record did not measure up to the Ivy League graduates whom we usually hire at Pharo. However, Chris proved my skepticism wrong when he turned out to be one of the most loyal, hard-working and reliable members of my team. He began working in the operations area in a position that required discipline and focus. The tasks assigned to him were unglamorous and repetitive, yet in the two years that he worked at Pharo he never complained and always did his work diligently and reliably. I was also impressed by his charisma, his humor, his team spirit and his generally positive attitude. For someone who had witnessed and suffered the heartbreaking loss of his only brother, Chris was coping with surprising strength and courage. He never let anyone see his devastation but instead focused on moving forward. During his two years at Pharo, Chris proved to be a hardworking, general individual who was loyal, not only to his company but also to his colleagues. Since he has been in prison, I have been able to exchange with Chris on occasion. Despite the jail time he has already served, he is the same good-natured person I met 16 years ago and he acknowledges and deeply regrets the mistakes he has made.

As indicated in Mr. Fonkenell's letter, Mr. Curanovic was trying to excel at school and a career while carrying a remarkable degree of pain. Mr. Curanovic never had therapy or mental health treatment to help cope with the childhood abuse, feelings of abandonment, anger and family loss. He tried to manage these feelings himself but as someone who lived with extreme trauma, Mr. Curanovic was susceptible to negative influences.

Many of the life factors that are outlined in this sentencing submission were not known to Judge Cogan at the time he imposed a sentence of 114 months, and they may well have mitigated the sentence Mr. Curanovic received. We ask Your Honor to now consider the role these traumas played in Mr. Curanovic's life. Moreover, there is ample evidence that Mr. Curanovic is ready for a second chance with the steady support of his family. Mr. Curanovic's cousin's husband has a job waiting for him in construction and Mr. Curanovic will have strong and immediate community ties upon his release. This is something this 38-year-old man has never had. Mr. Curanovic's

cousin fully anticipates him coming to live in her home with her family until he gets on is feet. He also looks forward to strengthening his relationships with him mother's family, including his aging grandparents.

Further, Mr. Curanovic has managed to maintain relationships with an impressive array of upstanding and successful people such as Mr. Fonkenell, his former employer and owner of a billion-dollar hedge fund. In the letters submitted on Mr. Curanovic's behalf, Your Honor will also read testaments to Mr. Curanovic's good character from a former congressional staffer, attorney, county council member, actor and other upstanding people who have known Mr. Curanovic for decades. All of these individuals have shared their stories of Mr. Curanovic's generosity, loyalty and kindness to aid Your Honor in understanding who Mr. Curanovic really is. They believe in Mr. Curanovic and the last thing he wants is to let them down.

## IV.    <u>Mr. Curanovic's Time In Custody</u>

Mr. Curanovic has already spent a significant portion of his life in prison working toward rehabilitation. Mr. Curanovic has held work assignments as a building orderly, as a yard detail worker and as a food services worker between 2011 and 2017. He has also completed several courses including math, physics, mythology, literature, art, accounting and HVAC was well as a drug education program and an anger management program. What he has not had the benefit of is meaningful therapeutic treatment and a chance to show he can thrive back with his family and community. He clearly recognizes the benefit mental health treatment will have on him and he understands that he cannot heal by carrying his burdens alone.

The sentence Mr. Curanovic received from Judge Cogan has now expired. According to the Probation Department that sentence expired on March 19, 2019. This, however, was a maximum expiration date that did not allow Mr. Curanovic any time in a halfway house – for

which he could have received up to one-year. The computation of his sentence is further complicated by the fact that Mr. Curanovic is in this District on a writ, accordingly, the Bureau of Prisons ("BOP") will not give him any credit on the instant case until sentence is imposed. Under BOP policy, Mr. Curanovic will also likely not received credit from the date of the filing of the charges in this case – June 2017 – a loss of two and one half years. To further complicate matters, despite the fact that Mr. Curanovic's sentence before Judge Cogan has expired, he will soon be resentenced by Judge Cogan as his conviction under 18 U.S.C. § 924(c) is now invalid by the Supreme Court's recent decision in *United States v. Davis*, 139 S. Ct. 2319, 2019 WL 2570623 (2019). Thus, 60 months of Mr. Curanovic's 114 month term of incarceration is now invalid.

In addition, due the pendency of this case, Mr. Curanovic has spent the last two and a half years at the Metropolitan Detention Center ("MDC") in Brooklyn, thus making his term of incarceration significantly harder than that of the average inmate. In fact, Mr. Curanovic was among those inmates that were subjected to the inhumane conditions at the MDC in January of 2019. During this period of time there was no heat (despite the frigid temperatures), no electricity or lighting and scant food for well over a week. Mr. Curanovic was confined to an interior cell in which there was no light at all. The conditions were so bad that he was unable to see his bunk-mate. There was also an electrical fire that sent smoke billowing through the ventilation system directly into Mr. Curanovic's cell. During this time Mr. Curanovic suffered extreme anxiety as he feared his imminent demise knowing there was no escape. Mr. Curanovic was cut off from any contact with the outside world and there was not even a hint of assistance from the prison staff.

Judges in both the Eastern and Southern Districts of New York have recognized the inhumane conditions at the MDC during this time period and have, in several cases, cited these conditions as partial justification for below-guideline sentences. See, *United States v. Bruney*, 18

Cr. 542 (PKC) (EDNY); *United States v. Ricardo Forde*, 18 Cr. 550 (CBA) (EDNY); *United States v. Acosta de la Rosa* (PKC) (EDNY); *United States v. Lincoln Douglas*, 18 Cr. 554 (PKC) (EDNY); *United States v. Arvinsingh Canaye*, 18 Cr. 102 (KAM) (EDNY) *United States v. Ivars Ozols*, 16 Cr. 692 (JMF) (SDNY); *United States v. Memet Gezer*, 16 Cr. 282 (CM) (SDNY).

Given all of these facts, including the conditions of his incarceration, the Defense asserts that a sentence of time served is appropriate in this case.

## V.     Conclusion

For the reasons stated above, a sentence of time served would be sufficient but not greater than necessary to accomplish the objectives of sentencing, and we respectfully request that the Court sentence Mr. Curanovic accordingly. We ask the Court to consider Mr. Curanovic's background and how he is now in a position to change his life if given the proper level of support and treatment.

Now is the time for Christopher Curanovic to begin that next phase of his life.


Respectfully submitted,

/s/ Elizabeth E. Macedonio
Elizabeth E. Macedonio
*Attorney for Christopher Curanovic*