

U.S. Department of Justice

United States Attorney
Eastern District of New York

MTK
F. #2016R00614

271 Cadman Plaza East
Brooklyn, New York 11201

December 23, 2019

By Hand and ECF

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Christopher Curanovic
                  Criminal Docket No. 17-404 (S-1)(KAM)

Dear Judge Matsumoto:

        The government respectfully submits this letter in advance of the defendant Christopher Curanovic's sentencing in the above-captioned case, which is scheduled for January 9, 2019 at 11:00 a.m. On May 24, 2019, the defendant pleaded guilty pursuant to a plea agreement before Your Honor, to one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). For the reasons set forth below, the government respectfully requests that the Court impose a sentence within what the government submits is the applicable United States Sentencing Guidelines ("Guidelines" or "USSG") range of 57 to 71 months' imprisonment.

    I.    Background

        The Pre-Sentence Investigation Report ("PSR") accurately sets forth the offense conduct. Between October 2016 and June 2017, Christopher Curanovic used extortionate means to collect a $40,000 debt owed by a former associate ("CS-1") to Curanovic. The debt was incurred in 2007 when CS-1 was approached by associates of the an organized crime family of La Cosa Nostra for payment of protection money. CS-1 began making payments to these individuals, but was soon unable to continue the payments. Thereafter, Curanovic approached CS-1 and offered to make a lump sum payment of $40,000.00 on behalf of CS-1 in exchange for the cessation of the protection money. The La Cosa Nostra associates agreed to this arrangement and the payment was made.

        In March 2008, the defendant was arrested for conduct related to his association with the Colombo crime family of La Cosa Nostra. He was convicted at trial of, among other things, racketeering conspiracy, use of a firearm during a crime of violence, extortion, and the extortionate collection of credit. See United States v. Curanovic, 08 CR

240 (BMC). As noted in the PSR, the defendant routinely collected extortionate debts on behalf of the Colombo family. During one such collection, Curanovic attempted to impale a business owner's hand with a screwdriver. He also threatened the business partner of that victim by holding a knife to his throat. PSR ¶ 72. Judge Cogan sentenced Curanovic to 114 months' imprisonment.

Beginning in October 2016, Curanovic, from prison, sent threatening text messages to CS-1 regarding the payment of the $40,000.00 debt. CS-1 sent screen shots of the text messages to DEA agents. For example, Curanovic stated "I saved u from that other guy. And im getting it from u" and "u gonna be a man and take care of it." During a phone call later that month, Curanovic informed CS-1 that he was willing to go back to prison in order to get his money from CS-1. Curanovic also stated, "If in two weeks you don't have what you are supposed to have, okay, then I'm going to take that as you saying 'fuck you' to me." Curanovic sent additional threatening text messages to CS-1 informing CS-1, in sum and substance, that the debt needed to be paid immediately. For example, Curanovic texted CS-1, "WHAT R U GOING TO HAVE FOR ME" and "I'm not going thru this shit not [sic] more."

Through a DEA sting operation, including the use of wiretap evidence and confidential sources, agents were able to determine that Curanovic, Albert Veliu and Anthony Noterile devised a scheme whereby a money laundering operation would facilitate the payment of Curanovic's extortionate debt. Veliu and Noterile agreed to meet with a DEA source ("CS-2") who represented himself as an associate of CS-1. During the course of the investigation, CS-2 provided the defendants with approximately $800,000 in purported drug proceeds for laundering. In recorded conversations, the defendants agreed to launder the funds in exchange for keeping a portion of the laundered funds as a commission and another portion as the payment of the extortionate debt owed to Curanovic. Thereafter, co-conspirators facilitated the money laundering scheme by, among other thing, exchanging the cash for purportedly "clean" checks supported by fraudulent paperwork. Curanovic was aware that at least $120,000 had been laundered on his behalf.

II. Guidelines Calculation

The government's Guidelines calculation, as set forth in the parties' plea agreement, is as follows:

Extortionate Collection of Credit Conspiracy (§ 1B1.3)

| | |
|---|---|
| Base Offense Level (§ 2E.2.1(a)) | 20 |
| Total: | **20** |

Count Three (Money Laundering Conspiracy)

| | |
|---|---|
| Base Offense Level (§ 2S1.1(a)(2)) | 8 |

| | | |
|---|---|---:|
| Plus: | Value of the Funds (§ 2B1.1(b)(1)(E)) | +8 |
| Plus: | Conviction under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| Plus: | Defendant Knew Laundered Funds Were Proceeds of Sale of Controlled Substance (§ 2S1.1(b)(1)) | <u>+6</u> |
| | Total: | <u>24</u> |

| Grouping Analysis (§ 3D1.4): | Level | Units |
|---|---|---|
| Extortionate Collection of Credit Conspiracy (§ 1B1.3) | 20 | 1 |
| Count Three | 24 | 1 |
| Total Units | | <u>2</u> |

Offense Level Calculation

| | |
|---|---:|
| Highest Offense Level (§ 3D1.4(a)) | 24 |
| Increase in Offense Level (§ 3D1.4(a)) | +2 |
| **Total Offense Level** | <u>26</u> |

      The Probation Department calculated that the defendant's criminal history score is 5, and that his criminal history category therefore is III.[1]  PSR ¶ 75.  After three levels are subtracted from the total offense level of 26 to reflect the defendant's acceptance of responsibility, the resulting offense level is 23.  This results in an applicable Guidelines range of 57 to 71 months' imprisonment.

      The Probation Department, while reaching the same offense level of 23, calculated the Guidelines differently from the government.  As an initial matter, Probation determined the base offense level pursuant to

> USSG § 2S1.1(a)(1), which instructs the use of the offense level for the underlying offense (Extortionate Extension of Credit), since the defendant committed the underlying offense and the offense level for that offense can be determined.  The applicable

---

[1] In the plea agreement, the government estimated that the defendant was in Criminal History Category IV.  After review of the PSR, the government agrees with the Probation Department's calculation of Criminal History Category III.

3

> guideline for the underlying extortion offense is USSG § 2E2.1(a), which provides base offense level of 20.

PSR ¶ 61. However, the government submits that USSG § 2S1.1(a)(1) should only be used when the defendant is responsible for the underlying offense "from which the laundered funds were derived." See USSG § 2S1.1(a)(1). In this case, the laundered funds were allegedly derived from the sale of narcotics proceeds, not the collection of an extortionate debt. While the impetus of the money laundering scheme stemmed from CS-1's debt, the funds actually laundered were the supposed proceeds from narcotics trafficking. Since Curanovic was not responsible for the narcotics trafficking, the government submits that the correct base offense level is § 2S1.1(a)(2). However, as reflected in the plea agreement, the government believes that the extortionate collection of credit conspiracy charged in Count Two of the indictment should be considered as relevant conduct under USSG § 1B1.3.

### III. The Appropriate Sentence

The government respectfully submits that a Guidelines sentence is warranted in this case to, inter alia, reflect the defendant's criminal history, to sufficiently punish his criminal conduct, to protect the public and to achieve general and specific deterrence.

#### A. Applicable Law

The government respectfully submits that a Guidelines sentence is appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). Interpreting the Supreme Court's decision in United States v. Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). "While district courts enjoy discretion following Booker, that discretion must be informed by the § 3553(a) factors[.]" Id. at 132 (internal quotation marks omitted). In this case, the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a Guidelines sentence.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

#### B. Analysis

##### 1. Curanovic's Role in the Money Laundering Conspiracy

As an initial matter, it cannot be overstated that the defendant's criminal conduct, including the money laundering conspiracy, took place while he was in federal

4

prison. Indeed, through the use of a contraband cellular telephone, Curanovic attempted to collect a debt through extortionate means and later agreed to participate in a money laundering conspiracy that would not only pay off that debt, but also provide a new source of criminal proceeds to line his pockets.

In his sentencing submission, Curanovic attempts to paint himself as a passive participant in the scheme. In fact, following the March 2017 receipt of $100,000, it was Curanovic who pressed Albert Veliu to continue the laundering scheme. For example, on the following dates Curanovic reached out to Veliu regarding CS-2:

- 4/1/2017: "Call [CS-2]"
- 4/7/2017: "What about [CS-2]? Did he call you?"
- 4/18/2017: "What about [CS-2]? You Talk to him?"
- 4/20/2017: "Alright it uh, what about [CS-2]? Nothing?"
- 4/24/2017: "Find a way. Call [CS-2] up plsss."
- 4/26/2017: "Did you talk to [CS-2]"?
- 5/1/2017: "Anything with ray or [CS-2]?"
- 5/23/2017: "Can u use same guy as last time for [CS-2]?"

The defendant's submission also states that Curanovic "did not ask when he was getting a part of the money." See Def. Mem. at 5. However, in a March 15, 2017 text message, shortly after receiving the first $50,000 from CS-2, Veliu stated that he would "take care" of Curanovic. Curanovic replied, "ok beautiful."

2. The Extortionate Collection of Credit as Relevant Conduct

The defendant's sentencing submission also takes issues with the characterization of Curanovic's loan to CS-1 as an "extortionate debt." See Def. Mem. at 2-3. However, the indictment charged Curanovic with violating 18 U.S.C. § 894 – the extortionate <u>collection</u> of credit. Section 894 prohibits the use of "any extortionate means . . . to collect or attempt to collect any extension of credit or . . . to punish any person for the nonrepayment thereof." 18 U.S.C. § 894. The defendant was not charged with the extortionate <u>extension</u> of credit, as his memorandum seems to suggest. In any event, defense counsel also contests that Curanovic "engaged in extortionate behavior to collect this debt." See Def. Mem. at 3-4. Curanovic's own words, however, prove otherwise. As discussed above, Curanovic stated, among other things, that he was "willing to go back to prison" in order to get his money back from CS-1. This was plainly a threat to cause harm to CS-1 if CS-1 did not pay his debt. To attach any other meaning to this statement strains credulity.

Furthermore, Curanovic's past criminal conduct and his conduct following his interactions with CS-1 clearly demonstrate that he is no stranger to collecting extortionate debts. Indeed, as the PSR notes, Curanovic was adept at using screwdrivers and knives to convince people to pay their debts. PSR ¶ 72. This skill was obviously not lost on Albert Veliu. On May 8, 2017, Veliu texted Curanovic and asked for assistance in the collection of another extortionate debt. Veliu informed Curanovic that the debtor owed his cousin, co-

5

conspirator Ekram Sejdija, $38,000.00.  The following text message exchange occurred between Curanovic and Veliu:

| | | |
|---|---|---|
| VELIU: | | He ows my cuz 38g |
| VELIU: | | Coz we need to find this mother fucker |
| CURANOVIC: | | Wherws his office.  Get me as much info as possible |
| VELIU: | | Ok |
| CURANOVIC: | | Wheres his office |
| CURANOVIC: | | That is important |
| VELIU: | | John Doe #2<br>Office #718 [redacted] |
| CURANOVIC: | | Its in queens right |
| VELIU: | | [Name of company] |
| VELIU: | | Brooklyn |
| CURANOVIC: | | Yes.  That's my friends neighborhood.  Im gonna find out |
| CURANOVIC: | | U sure Brooklyn |
| CURANOVIC: | | They got 2 offices…1 in bk and 1 in queens |
| CURANOVIC: | | Ok…13th ave.  Lemme see. |
| CURANOVIC: | | If I get these fukn italians involved they gonna want smth |
| CURANOVIC: | | But lemme ask around |

Four days later, Curanovic -- from jail -- texted Veliu.  The following text message exchange occurred:

CURANOVIC:   My friend is working on solving tge problem w [John Doe #2]

6

| | | |
|---|---|---|
| CURANOVIC: | | He had a visit today |
| VELIU: | | Nice. So where do we stand |
| VELIU: | | He did the job. |
| CURANOVIC: | | Yeah. I know. Someone I know kniws him from the neighborhood |
| CURANOVIC: | | So lets see |
| VELIU: | | Ok. |

Based on his own statements, Curanovic managed to get the "Italians involved" in an attempt to intimidate John Doe #2 into paying his debt.

In sum, Curanovic's statements to CS-1 were, on their face, implied threats to injure CS-1 if the debt was not immediately paid. As Probation has determined, "these activities compromise relevant conduct to the instant offense" of money laundering conspiracy. PSR ¶ 52.

### 3. Specific and General Deterrence

A Guidelines sentence is also necessary here in order to ensure that the sentencing goals of specific and general deterrence are appropriately met. With respect to specific deterrence, the imposition of a significant term of imprisonment is meaningful punishment that will likely deter the defendant from reoffending -- something that previous sentences provided to the defendant have been unable to accomplish. In fact, the defendant's previous sentence did not even deter him from committing crimes during the pendency of his sentence.

With regard to general deterrence, a Guidelines sentence will send a strong message to the community that this type of criminal conduct will be punished with a significant term of incarceration. Such a sentence will make plain that money laundering, a crime that allows criminals to reap the fruits of their misdeeds, will simply not be tolerated.

## IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a Guidelines sentence, which is sufficient, but not greater than necessary, to achieve the goals of sentencing. See U.S.S.G. § 3553(a)(2).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:  /s/
Michael T. Keilty
Assistant U.S. Attorney
(718) 254-7528

cc: Elizabeth Macedonio, Esq. (by ECF)
    Clerk of Court (KAM) (by ECF)